We have four RU cases this morning. The first is No. 24-1190, Express Mobile v. Meta Platforms. Mr. Hasham. Thank you, and may it please the Court. I want to address three errors by the Board. First, the Board adopted an incorrect construction of player that included prior art virtual machines. Express Mobile's response brief below proposed that a player facilitates execution of an application on a machine, but is not itself a real or virtual machine. But you never asked for a construction of player. You did argue as a factual matter that a player didn't include a virtual machine, but you didn't ask for a claim construction, right? So in our response brief, we argued- Yes or no? We did ask for a construction. We asked for a construction in our server-applied brief as the Board recognized in the- Yeah, but you're not only in the server-applied brief and at the oral argument, right? The Board recognized in Appendix 80 that we asked for a construction. No, you're not answering my question. You're only in the server-applied brief and the oral argument, right? Not in the response. We did not ask for a construction expressly in the response brief, no. So if Your Honor is asking about the Board's waiver issue, so our response brief argued the substance of the argument that we present on appeal under Summit 6 and Entertainer versus Hulu, the argument is preserved. Insofar as the Board was focused on the fact that we didn't use the words claim construction in our response brief, that was because of how the dispute evolved. There's a parallel district court litigation. In the district court, defendants argued that a player executes the application like a virtual machine, whereas we argued that a player facilitates execution. But at bottom, this is not a claim construction case, is it? I mean, we're looking at substantial evidence. So Your Honor, I believe this is a claim construction case. We think this is a classic O2 micro homeland house first case where initially the party's dispute was framed in terms of their interpretations of the competing district court constructions. That's what we were doing in our response brief at Appendix 2415. How can that be an O2 micro case when you didn't ask in the response for a claim construction? So O2 micro and homeland house first and subsequent cases recognize that further construction, PAPS is another one, that further construction can be required. So at the outset of this, there are competing district court constructions, and then the parties recognize that the competing district court constructions don't really resolve the dispute. And so at that point, MEDA was actually the one at Appendix 4283 that recognized this was a claim construction dispute. But what do we do about the standard of review that we apply to the board's determination that your request for construction in the Surrey Ply was untimely? So the board's, the standard of review, so MEDA argues that the standard of review is abuse of discretion. We don't agree. We believe that the court applies its precedent for waiver. Cases like Entertainer v. Hulu, 660F, 943, is an exactly on-point case where it became apparent later on that there was, in fact, a claim construction dispute. Additionally But under our precedent with respect to IPRs and PTAB proceedings, don't we apply an abuse of discretion standard to the board's determination of when it is appropriate to raise a claim construction issue? Generally not. So And I understand there can be a legal error that causes there to be an abuse of discretion. But I'm having a hard time why you're not understanding why you wouldn't agree that we need to give discretion to the PTAB's determination that in its proceedings there's a time at which claim construction is supposed to be provided. In general, if there was a situation where we just had not raised this issue at all, cases like Google have found that you can defer to the board's interpretation of whether there was a waiver. But in this particular case, what happened is that if you look at the board's decision at Appendix 42, the board said that we did not propose a construction because the board did not recognize that there was an O2 microissue, that there were these two competing district court constructions, executing the application versus facilitating execution. We argued that those are mutually exclusive and that facilitating the execution requires something more than execution, whereas META disagreed. And so at that point, there was a claim construction dispute and the board simply misapprehended that. Generally, do you think O2 micro applies in a situation like this? The reason why I ask is because I always think of O2 micro as something that is going to make it so it's the job of the court, not the job of the jury, to interpret claims. But when you're talking about an IPR and a PTAB case, I'm having a hard time understanding why that applies. So this court has applied O2 micro to PTAB cases in Homeland Housewares, but I think it actually points in the other direction. Here, the PTAB is both the interpreter of the law and the fact finder. And so where you have, and as the PTAB acknowledged at Appendix 80, we presented, what the PTAB says in its rehearing decision at Appendix 80 is that we presented the substance of the argument and then says that it addressed it in its final written decision. So here, there is no reason where the parties briefed the argument, briefed it in terms of the specification and the intrinsic evidence, which is the only thing that's in dispute. There's no factual extrinsic evidence. And then the board says that it actually addressed the arguments and passed upon the arguments. There's no reason, there's no barrier to this court's review. But even under, if this is a substantial evidence review, the board's, you know, understanding of the claim must be reasonable. And here, if the court were to please- Well, you don't argue that it's a substantial evidence case on this point. No, our position is that the board should have construed the claim. But for the court's review, if, you know, the court concludes that claim construction isn't warranted, then substantial evidence review applies. I think your claim construction argument stands on flimsy ground. And especially since you're making it your main point this morning. You hardly made it before to the board, and now it's the main point of impression before us. And I would find that your arguments have been waived in this situation. So it may be a good idea to get on to whether the JVM acts as the claim player. So the board found, so in this particular case, the issue of whether the JVM, whether the claims exclude virtual machines, or whether the claims exclude the JVM specifically are indistinguishable. They're the same analysis. Because the patent, when it uses the term virtual machine, the JVM is the very thing that the patent is referring to. So the patent uses the term Java over and over again. But the only examples of virtual machines mentioned in the patent at column 7, lines 27 through 29, are Java virtual machines. Java CDC, Java 2 standard edition, and MIDP 2, which is an embedded version of Java. And what the patent says is the player allows, those are incompatible with each other, and the player allows the applications to be compatible with those three incompatible virtual machines. Also if the court would look at page 10 of the blue brief, figure 4B, there is a Java phone. You can tell because there's a little Sun Microsystems logo, which is the inventors of Java. The Java phone had a JVM on it. But if you wrote an application for the Java phone, it wouldn't be compatible on Windows Mobile, it wouldn't be compatible on Android. And what the invention does is it allows you to, which is why the patentee coined this term player, for something that could make an application compatible with a Java phone, compatible with Android, compatible with iOS. And so in fact, the meta's argument and the board's suggestion that the virtual machine means something different than the JVM, in fact, you know, that is, the JVM is exactly what the patentee had in mind when it used the term virtual machine. Additionally, the board has this finding in its rehearing decision where the board says what the patent means by virtual machine is a virtual operating system like VMware. And in fact, there's no evidence, the board does not cite anything to support it, either intrinsic evidence or expert testimony. This was actually an argument that was raised as attorney argument for the first time by meta's counsel at the oral hearing. But a virtual machine in that sense is completely different from what the patent means. The patent, again, column 7 lines 27 through 29, is clearly referring to Java virtual machines. So the claim construction dispute here is indistinguishable from whether the claim excludes a Java virtual machine. This is not a case where meta, for example, presented a different kind of virtual machine that has additional capabilities. It identified in its petition the very thing that the patentee said was the prior art, and then said the player is an additional different thing that extends and augments the prior art virtual machine. This is like if a patent recites the term smartphone and then says, you know, it's different than a Nokia feature phone, and then an IPR petitioner comes in and uses the term feature phone and says that that's a smartphone. Counselor, the evidence here is in the prior art is the JVM, the Java machine, discloses or interprets Java code. Right? Yes. Do you agree with that? That's right. Okay. And in the 755 patent, the player, the player limitation also interprets Java code. That's one function of the player. Why is that not substantial evidence of obviousness? So the the the player, the claim player, you could have a scenario where if you look at figure to be there's the player and there's the virtual machine, you could have a component that combines those two functionalities. But the patent is very clear that in that embodiment, the execution is only one of the functions of the player. What the player does is additionally adapts the application to differences between devices that the JVM does not take care of. The JVM just executes code. Right. So if you look at the Java phone on figure for B, the reason you can't run this Java phone application on Windows or iOS is because Windows and iOS have, for example, different programming APIs for displaying objects on the screen. So even though the Java virtual machine allows you to adapt to different processors, the Java machine does not perform the additional adaptation functions that are described in the player. So again, you know, a smartphone also makes phone calls, but a feature phone that only makes phone calls would not be a smartphone. And that's the same thing with the player in JVM here. If the court has no more questions, I would like to turn to the limitation of that the player provides instructions for a display of the device. The court would look at Appendix 806. I think it's helpful to see... The issue here, again, wasn't raised as a claim construction issue, right? So, Your Honor, we're not raising this as a claim construction argument. The first argument that we have is... Well, isn't the question whether the instructions can come indirectly from the player through the browser? So the predicate question is whether the board provided any analysis at all. Wait, answer my question. You may want to talk about something else, but what I want to talk about is whether it can be indirect from the player through the browser. Yes. One of the issues that we raise is whether it satisfies the providing limitation for the player, the application, to provide HTML to the browser. And that actually raises two issues. One, whether HTML can be instruction. Isn't the issue that you're raising whether the player needs to do it directly or whether it can do it through the browser, providing the instructions? No, because it's the question... We don't dispute that the player could indirectly provide something to the browser. The question is whether the thing that the player provides is instructions. So in our response brief at Appendix 2427 through 2428, so Meta's petition didn't actually ever say that... What they're saying now, which is that HTML is the claimed instructions, Meta's petition simply pointed to a picture of the browser and said that display is happening and therefore the limitation is met. And so our response was, and this is at 2427, 2428, which is in our response brief, is that in the system of Anderson, Anderson's virtual machine and Java application are running on a web server, whereas the actual display is drawn by the browser. There's no dispute that the virtual machine does not actually talk to the display in the browser. And so our point in our response brief was that the instructions is what the browser is drawing, is providing to the screen of the device to display the graphical application to the browser. Now, Meta didn't actually raise this argument that HTML is the instructions. We'd argue it didn't raise it below at all. It raised it for the first time in its appellate briefing, but certainly the board never relied on it. So I wanted to reiterate... We're out of time. We'll give you two minutes to rebuttal. Thank you, your honors, if it may please the court. Am I to take it to mean that I don't need to argue the waiver point because I'm happy to go into why LSI... You can argue whatever you want. I just understood that Judge Reyna was saying assume that there's waiver and move on. But I just want to make sure the record is clear that for the player term, in order for them to have a dispute with what the judge did down below, where he found that the proposed construction was untimely, under LSI, they waive any argument unless the challenge to the finding of untimeliness was raised in the opening brief. And that's the LSI case, LSI versus Regents of Minnesota. A similar thing happened in that case. At the end of the day, didn't the board consider the construction argument that was placed before and say that we find that to be without merit? They did. And in fact, they did do that. And then they went on to show what their substantial evidence was to hold that, in fact, that proposed construction itself also had no merit. And if Your Honor's like, I can go through that. It's not substantial evidence on claim construction. I'm sorry? It's not substantial evidence on claim construction. No, no, no. It's substantial evidence that even if you use their claim construction, the art had met even their proposed construction. So I apologize if I was unclear. Do you want to argue claim construction then? Go ahead. Why don't you present why it is that the board did not err when it said the claim construction is incorrect? So the board did not err when it said that the claim construction was incorrect. The argument presented down below was that to be mandated that somehow the definition could not encompass a virtual machine. Although even there, they never actually used as a proposal that the virtual machine be excluded. So this is importing a negative limitation into a claim. Yes, it was a negative limitation. It just happened not to have been the exact limitation that they're saying here. The negative limitation was that the material not, that it be separate from the operating system, the programming language, and the platform. During oral argument, they actually, the board asked, does that even really get rid of the virtual machine? And they said, well, you can also add that in too if you want and add another negative limitation that says, and also not the virtual machine. None of those things happen. But the reason that it's not an appropriate construction, even if it were timely proposed, column 2B is only one embodiment. And we put, we make this very clear in our briefs. It's not even a preferred embodiment. It's a simple one embodiment. Column 10 lines 57 through 60 mandate that it's only one embodiment. That's also, we also have column 36, which indicates that those logical blocks that are in the figures are not necessarily meant to be sacrosanct. Instead, they can be swapped around. You can move some information from one into the other. And so there's no reason to believe that the patentee was saying that any virtual machine had to be separate from any player. Moreover, the board did find that the virtual machine of the patent was not equivalent to the Java virtual machine of the prior art. And I think I heard my learned colleague say that there was nothing to support the board's decision there. But in fact, the board in its rehearing petition, specifically when commenting on this argument on appendix 81, said the JVM is limited to executing Java code, whereas the virtual machine described in the patent and the file history more broadly replicates an operating system. They then compare the description of Java from the prior art at exhibit 103, page 35, and the other prior art with the review request made by appellant citing language in the 755 patent. And the review request specifically pointed out column one, where the operating system was equated with the virtual machine. So that's what the board was saying. You yourself have equated the virtual machine with an operating system. So that's something very different from the Java virtual machine, which does nothing more than interpret the materials that come through with it. The board went on to explain that, in fact, a device may run the Microsoft Windows operating system as a virtual machine and then run a JVM on top of that. And so the board did point to substantial evidence to show that the Java virtual machine of the prior art is not the same as the virtual machine in the patent and specification. So I think that helps establish both why the definition proposed is inappropriate. Column two says, only one embodiment, so there's no reason to import that limitation into the claim. Column 11, line 56 through 57 says, and don't hold me to the logical blocks that I have. And then finally, column five specifically describes what the player does, and it describes exactly what the JVM is. It's something that receives information, interprets it, and passes it along so that instructions can be executed. And so we believe that the board got it right the whole way through, but they also have waived any argument with respect to that. With respect to the second argument, and unless your honors have any other questions on that issue, I'll turn to the second argument. The second argument was somehow now that we never made an argument that HTML were instructions. The first thing I'd like to say here, this is an interesting issue because down below at the board, and your honor actually asked all the right questions, the issue down below was not what is an instruction, what is not an instruction. The issue down below was simply whether the instructions were provided by the browser or by the player, and that's at appendix 54, but also appendix 24, 28. Now for the first time on appeal, they're arguing that the instructions are not or cannot be HTML and instead have to be either programming language or commands. First, those arguments are waived because they were never presented to the board at all. In the blue brief, we now first see that instructions must be commands and must exclude a web page, and that's in the blue brief at 46 and 54. But the board didn't even have that issue in front of it. If we look at appendix 54, the board was addressing just the issue of what's passing the instructions along, and the board acknowledges that it's the HTML which is passed along and that those therefore are the instructions. In fact, appellant did not dispute at that time that those were instructions that were being passed forth. In fact, the actual quote is, patent owner, this is at the appendix 54, 50, 50, patent owner argues that the fails to teach this limitation because Anderson and Ambrose Haynes teach that a web server provides server-side processing and returns an HTML page to the browser of the client-side device. And thus, in the proposed combination, the web browser, not the alleged player, would provide any instructions for the display of the device to present any output values to other displays. Right there, the patent owner is saying, oh, the HTML page is the thing that's passed to the browser, and therefore any instructions for the display are passed to the browser. So they're saying the instructions are the HTML. So there was no reason for petitioner below to ever argue why it was or wasn't an instruction because everyone agreed that HTML were in fact instructions, and that's what the board found. And this is, again, at page 54 of the appendix. So here, again, this is an argument that was waived, but even if it wasn't, instructions are supplied, and the board did find substantial evidence that instructions were supplied, and again, that's all on page 54 of the appendix, where the board points out that the JVM player from Anderson carries out the functions of the Java application, resulting in instructions that cause display of the user interface on the web browser. Unless your honors have any other questions, I've exceeded my time. I appreciate it. Thank you very much. Yes, so if you would please turn to appendix 80. We actually, the argument that we made is the exact opposite of what my colleague says, and so at appendix 80, which is the board's final written decision. Oh, no, sorry. It's appendix 54. This is the board's final written decision. That was the same page that the Jersey Council was referring to. Okay. Which page? This is appendix 54. I apologize. This is the board's final written decision. Yeah. So the issue of- Where is this show that you made the argument? Say again. So what we explain, so the petition did not say what was the instructions, and so the issue of what is providing the instructions depends on what you identify as the instructions. Is it what the browser is providing to- Where did you make the argument that the HTML is not the instructions? And this is exactly what we say, what's being quoted by the board at appendix 54. We said, in the proposed combination, the browser, which is processing the HTML and drawing the display, is what provides any instructions for a display of the- That sounds like the indirect argument. I don't see that that's the HTML argument. So at appendix, at the cited page- And also, I think you added some words there. Did you? I mean, I'm sorry. What part of the page are you on? Oh, I'm sorry. So where it says, patent owner argues that the proposed combination fails to teach this limitation because Anderson Haynes teaches that a web server processes server-side HTML and returns an HTML page to the browser- So you just quoted something. Where is the quote? I don't see the exact quote that you just gave in that paragraph. The paragraph is, it begins at, quote, Anderson and Ambrose Haynes teach that a web server provides server-side processing and returns an HTML page. That's a quote from our response brief. Okay. Right? And so what we're saying- Where does it say that the HTML is not instructions? Well, because what we're saying is the browser, the application, the web server, returns HTML, right? But the browser is what processes it and provides the instructions. And so that's the exact argument we're making, which is the HTML is not the instructions. The instructions is what the browser produces after processing the HTML. Okay. I think we're out of time. Thank you. Thank both counsel. The case is submitted.